IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Edward W. Nottingham**

Civil Action No. 04–cv–00197–EWN–BNB


AMERICAN FIRE AND CASUALTY COMPANY and
THE OHIO CASUALTY INSURANCE COMPANY,

      Plaintiffs,

v.

BCORP CANTERBURY AT RIVERWALK, LLC, as Nominee,
BCORP HOLDINGS COLORADO, INC.,
BCORP MANAGEMENT, INC.,
KELLY BEGG,
GARY BEGG,
ANDREW GRAVES,
MARIA ALFARAZ,
JON HESS,
MELINDA THOMAS,
RYAN KNUTSEN,
ROSEMARIE LUMETTA,
DANA OVERBEY,
DAVID SEDDON,
BCORP ARLINGTON, LLC,
DAVID HOSLER,
CHRISTINE SUESS,
DEBBIE EYTCHESON, and
ADMIRAL INSURANCE COMPANY,

      Defendants.

---

## ORDER AND MEMORANDUM OF DECISION

---

This is an insurance issue arising in a faulty construction case.  Defendants Debbie

Eytcheson, David Hosler, and Christine Suess (collectively, the "Homeowners") assert that they

are entitled to insurance coverage under policies issued by Defendant Admiral Insurance

Company ("Admiral") for judgment entered in their favor and against Defendants BCORP-HRT,

LLC ("BCORP-HRT") and BCORP Arlington, LLC, as Nominee ("BCORP Arlington" and,

collectively, "BCORP").  In a somewhat unusual procedural twist, the only remaining parties in

this case are Defendants Admiral and Homeowners.  This matter is before the court on

"Defendant Admiral Insurance Company's Motion for Summary Judgment," filed December 13,

2006.  Jurisdiction is premised upon diversity of citizenship, pursuant to 28 U.S.C.S. § 1332

(LexisNexis 2007).

## FACTS

### I.    *Factual Background*

This case has a long and tortured history, which the court attempts to summarize as

concisely as possible.  In its current manifestation, this matter only concerns questions about

insurance coverage relating to a judgment awarded after trial of Homeowners' claims (the

"Underlying Action") regarding faulty construction of a condominium project located in Littleton,

Colorado, known as "Arlington."[1]

---

[1]To the court's understanding, BCORP and other related entities and individuals
constructed two condominium projects, "Arlington" and "Canterbury."  Residents of Arlington
and Canterbury brought two separate suits in state court concerning construction problems at
condominium projects.  As will be discussed, the Arlington case was litigated and resolved in state
court.  The Canterbury case was taken out of litigation and resolved in arbitration.  (*See* Notice of
Arbitration Award [filed Aug. 8, 2006].)  In the interest of clarity, the court refers to the

### a.      Arlington

BCORP Arlington was the developer of Arlington.  (Def. Admiral Ins. Co.'s Mot. for Summ. J., Statement of Undisputed Material Facts ¶ 1 [filed Dec. 13, 2006] [hereinafter "Admiral's Br."]; *admitted at* Defs.' Resp. in Opp'n to Def. Admiral Ins. Co.'s Mot. for Summ. J., Resp. to Statement of Undisputed Material Facts ¶ 1 [filed Jan. 5, 2007] [hereinafter "Homeowners' Resp."].)  BCORP-HRT was the general contractor for Arlington.  (*Id.*, Statement of Undisputed Material Facts ¶ 2; *admitted at* Homeowners' Resp., Resp. to Statement of Undisputed Material Facts ¶ 2.)

During trial of the Underlying Action, Homeowners' expert witness, Edward Fronapfel, testified that Arlington was not constructed using the floor-to-ceiling assemblies called for in the architectural plans for the project.  (*Id.*, Statement of Undisputed Material Facts ¶¶ 3–4; *admitted at* Homeowners' Resp., Resp. to Statement of Undisputed Material Facts ¶¶ 3–4.)  Specifically, the architectural plans called for an "L516 rated assembly," which has several requirements, including wood joists of certain measurements and the use of a "resilient channel," which is a metal strip that separates the building's framing from the drywall in order to provide fireproofing and soundproofing benefits.  (*Id.*, Statement of Undisputed Material Facts ¶ 5; *admitted at* Homeowners' Resp., Resp. to Statement of Undisputed Material Facts ¶ 5.)  Instead of implementing the L516 rated assembly requirements, BCORP-HRT substituted manufactured truss joints for the wood joists and omitted the resilient channels.  (*Id.*, Statement of Undisputed

Arlington litigation as the "Underlying Action," and avoids any unnecessary reference to the Canterbury case or the parties thereto.

Material Facts ¶ 6; *admitted at* Homeowners' Resp., Resp. to Statement of Undisputed Material Facts ¶ 6.)  It is undisputed that BCORP's substitution and omission adversely affected Arlington's fire safety rating and soundproofing.  (*Id.*, Statement of Undisputed Material Facts ¶ 7; *admitted at* Homeowners' Resp., Resp. to Statement of Undisputed Material Facts ¶ 7.)

Mr. Fronapfel testified further that construction of the walls between condominium units, or the "demising wall construction," failed to comply with architectural plans.  (*Id.*, Statement of Undisputed Material Facts ¶ 8; *admitted at* Homeowners' Resp., Resp. to Statement of Undisputed Material Facts ¶ 8.)  The architectural plans for the demising wall construction called for mineral fiber as a fire stop between staggered studs in the walls, but BCORP substituted wood, which served as an adequate fire stop, but adversely affected soundproofing between units. (*Id.*, Statement of Undisputed Material Facts ¶¶ 8–12; *admitted at* Homeowners' Resp., Resp. to Statement of Undisputed Material Facts ¶¶ 8–12.)

### b.    *The Homeowners*

In August 2000, David Hosler purchased and inhabited unit 207 at Arlington.  (*Id.*, Statement of Undisputed Material Facts ¶ 29; *admitted at* Homeowners' Resp., Resp. to Statement of Undisputed Material Facts ¶ 29.)  In September 2000, Christine Suess purchased and inhabited an unspecified unit at Arlington.  (*Id.*, Statement of Undisputed Material Facts ¶ 40; *admitted at* Homeowners' Resp., Resp. to Statement of Undisputed Material Facts ¶ 40.)  In or about September 2001, Debbie Eytcheson purchased and inhabited unit 204 at Arlington.  (*Id.*, Statement of Undisputed Material Facts ¶ 23; *admitted at* Homeowners' Resp., Resp. to

Statement of Undisputed Material Facts ¶ 23.)  Homeowners have all maintained that their units were extraordinarily noisy.

Mr. Hosler testified that in his unit he heard: (1) loud music from the unit beneath his; (2) his neighbors' televisions, telephones, alarm clocks, blenders, microwaves, stereos, conversations, snoring, and footsteps; and (3) running water and whistling air.  (*Id.*, Statement of Undisputed Material Facts ¶¶ 30–31, 34; *admitted at* Homeowners' Resp., Resp. to Statement of Undisputed Material Facts ¶¶ 30–31, 34.)  In a somewhat successful attempt to reduce the noise level in his unit, Mr. Hosler moved his bed into his living room and spent approximately $5,300 installing insulation and other improvements.  (*Id.*, Statement of Undisputed Material Facts ¶¶ 36–37; *admitted at* Homeowners' Resp., Resp. to Statement of Undisputed Material Facts ¶¶ 36–37.)  Mr. Hosler was embarrassed by the noises he heard and the placement of his bed in the living room.  (Homeowners' Resp., Additional Statement of Undisputed Facts ¶ 12; *admitted at* Def. Admiral Ins. Co.'s Reply in Supp. of Mot. for Summ. J., Resp. to Homeowners' Additional Statement of Undisputed Facts ¶ 12 [filed Jan. 22, 2007] [hereinafter "Admiral's Reply"].)

Ms. Suess testified that in her unit she heard: (1) running water; (2) her neighbors' voices, telephones ringing, and electrical appliances running; (3) a neighbor's piano; (4) "dragging" sounds from her upstairs neighbor; and (5) noises in the hallways.  (Admiral's Br., Statement of Undisputed Material Facts ¶¶ 41–42; *admitted at* Homeowners' Resp., Resp. to Statement of Undisputed Material Facts ¶¶ 41–42.)  Ms. Suess testified that the noises bothered and embarrassed her.  (*Id.*, Statement of Undisputed Material Facts ¶ 43; *admitted at* Homeowners' Resp., Resp. to Statement of Undisputed Material Facts ¶ 43.)

Ms. Eytcheson testified that she heard the following sounds in her unit, which she described as "the sound[s] of munchkins:" (1) her neighbors using and flushing their toilets; (2) water running through pipes in the walls; (3) her neighbors' footsteps and conversations, as well as their televisions, telephones, and other electrical appliances; (4) voices in the hallways; and (5) hallway doors opening and closing.  (*Id.*, Statement of Undisputed Material Facts ¶¶ 25–26; *admitted at* Homeowners' Resp., Resp. to Statement of Undisputed Material Facts ¶¶ 25–26, Ex. 5 [Eytcheson Aff.].)  Ms. Eytcheson testified that the noises bothered and embarrassed her, and she: (1) experienced stress, anxiety, frustration, and paranoia; (2) felt dazed; and (3) did not feel safe, secure, or comfortable in her own home.  (*Id.*, Statement of Undisputed Material Facts ¶ 27; *admitted at* Homeowners' Resp., Resp. to Statement of Undisputed Material Facts ¶ 27.)

c.      ***Arlington Repairs and the Underlying Action***

After receiving complaints concerning noise levels at Arlington, BCORP attempted to correct the issue by installing insulation and resilient channels in certain condominium units.  (*Id.*, Statement of Undisputed Material Facts ¶¶ 13–14; *admitted at* Homeowners' Resp., Resp. to Statement of Undisputed Material Facts ¶¶ 13–14.)  These repairs neither addressed the entire floor-to-ceiling assembly between condominium units nor brought Arlington into compliance with the original architectural plans.  (*Id.*, Statement of Undisputed Material Facts ¶¶ 15–16; *admitted at* Homeowners' Resp., Resp. to Statement of Undisputed Material Facts ¶¶ 15–16.)  Moreover, in the process of conducting the repairs, BCORP used screws longer than those called for by an L516 rated assembly.  (*Id.*, Statement of Undisputed Material Facts ¶ 17; *admitted at* Homeowners' Resp., Resp. to Statement of Undisputed Material Facts ¶ 17.)  The longer screws

pierced the resilient channels and entered the framing of the Arlington structure, thereby diminishing the soundproofing capacity of the channels.  (*Id.*)

On or about August 29, 2002, dissatisfied with the repairs, Homeowners and several other Arlington residents jointly filed the Underlying Action in state court.  (*Id.*, Statement of Undisputed Material Facts ¶ 18; *admitted at* Homeowners' Resp., Resp. to Statement of Undisputed Material Facts ¶ 18.)  Plaintiffs in the Underlying Action asserted claims for: (1) negligent construction of Arlington; (2) violation of the Colorado Consumer Protection Act; (3) negligent misrepresentation of Arlington's condition; (4) negligent omission, non-disclosure, or concealment of Arlington's condition; (5) breach of implied warranty; and (6) negligent repair.  (*Id.*, Ex. 5 [Compl. and Jury Demand].)  From the record before the court, it appears the state court dismissed some of the Homeowners' claims.  The only claims that went to trial were: (1) the Homeowners' claims for violation of the Colorado Consumer Protection Act, negligence, and negligent repair; and (2) Mr. Hosler's and Ms. Suess's additional claims for breach of implied warranty and breach of contract.  (*Id.*, Ex. 1 at 37 [Jury Instructions], Ex. 11 [Special Verdict Form], Ex. 12 [Special Verdict Form], Ex. 13 [Special Verdict Form].)

Homeowners were successful on all of their claims in the Underlying Action.  The jury awarded each Homeowner $150,000 in noneconomic damages and $1,500 in damages for loss of use.  (*Id.*, Statement of Undisputed Material Facts ¶¶ 46–48; *admitted at* Homeowners' Resp., Resp. to Statement of Undisputed Material Facts ¶¶ 46–48.)  In addition, the jury awarded: (1) Mr. Hosler $5,300 in economic damages and $29,555.05 in damages for reasonable and necessary repairs, for a sum total of $186,355.05; (2) Ms. Suess $31,096.51 in damages for reasonable and

necessary repairs, for a sum total of $182,596.51; and (3) Ms. Eytcheson $28,735.20 in damages

for reasonable and necessary repairs, for a sum total of $180,235.20. (*Id.*)  On September 1,

2005, the trial court entered judgment for each Homeowner, providing for prejudgment interest.

(*Id.*, Statement of Undisputed Material Facts ¶ 49; *admitted at* Homeowners' Resp., Resp. to

Statement of Undisputed Material Facts ¶ 49.)  The final judgment granted Mr. Hosler

$267,792.23, Ms. Eytcheson $241,188.55, and Ms. Suess $262,608.85.  (*Id.*)  On March 9, 2006,

the trial court awarded Mr. Hosler and Ms. Suess $7,285.42 each in attorney fees and awarded

Ms. Eytcheson, Mr. Hosler, and Ms. Suess a combined total of $33,413.44 in costs.  (*Id.*,

Statement of Undisputed Material Facts ¶ 50; *admitted at* Homeowners' Resp., Resp. to

Statement of Undisputed Material Facts ¶ 50.)

　　　　This court underscores that there is little dispute concerning the general facts of the case.

Indeed, the only issue presently before the court is whether coverage is available under insurance

policies that Admiral issued to BCORP for the judgments awarded to Homeowners in the

Underlying Action.  (*Id.*, Statement of Undisputed Material Facts ¶ 54; *admitted at* Homeowners'

Resp., Resp. to Statement of Undisputed Material Facts ¶ 54.)  The main point of contention

between the parties is evidently whether Homeowners have established that they experienced any

personal injuries, sicknesses, or illnesses so as to trigger insurance coverage by Admiral,

presumably because both BCORP-HRT and BCORP Arlington are now bankrupt entities.  (*See*

Suggestion of Bankruptcy [filed Mar. 22, 2006].)

### d.    Admiral's Insurance Policies

On an undisclosed date, Admiral issued a commercial general liability ("CGL") policy, number A01AG09920, to BCORP-HRT, which was effective from January 31, 2001 through January 31, 2002 (the "First Policy").[2]  (Admiral's Br., Statement of Undisputed Material Facts ¶ 51; *admitted at* Homeowners' Resp., Resp. to Statement of Undisputed Material Facts ¶ 51.) Thereafter, Admiral issued a second CGL policy, number A02AG121517, to BCORP-HRT, which was effective from January 31, 2002 through January 31, 2003 (the "Second Policy").  (*Id.*, Statement of Undisputed Material Facts ¶ 52; *admitted at* Homeowners' Resp., Resp. to Statement of Undisputed Material Facts ¶ 52.)  BCORP Arlington was an additional named insured under both the First Policy and the Second Policy (collectively, the "Policies").  (*Id.*, Statement of Undisputed Material Facts ¶ 53; *admitted at* Homeowners' Resp., Resp. to Statement of Undisputed Material Facts ¶ 53.)

The Policies both contained the following language setting forth the parameters of coverage:

> [Admiral] will pay those sums that [BCORP] becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. . . .  This insurance applies to "bodily injury" or "property damage" only if: (1) [t]he "bodily injury" or "property damage" [was] caused by an "occurrence[;]" and (2) [t]he "bodily injury" or "property damage" occur[red] during the policy period.

---

[2]The general purpose of CGL insurance is to "protect[] businesses from third party claims for personal injury or property damages resulting from accidents."  *See Hoang v. Monterra Homes (Powderhorn) LLC*, 149 P.3d 798, 802 (Colo. 2007) (citation omitted).  "A typical CGL policy broadly defines the damages to which it applies and then specifically lists exclusions to the broad grant of coverage."  *Id.*

(*Id.*, Ex. 18 at 6 [First Policy], Ex. 19 at 6 [Second Policy].)  Under the Policies, "bodily injury" is

any "bodily injury, sickness or disease sustained by a person, including death resulting from any of

these at any time."  (*Id.*, Ex. 18 at 15 [First Policy].)  "Property Damage" is either: (1) "[p]hysical

injury to tangible property, including all resulting loss of use of that property;" or (2) "[l]oss of

use of tangible property that is not physically injured."  (*Id.*, Ex. 18 at 28 [First Policy].)  Finally,

an "occurrence" is "an accident, including continuous or repeated exposure to substantially the

same general harmful conditions."  (*Id.*, Ex. 18 at 17 [First Policy].)

The Policies also set forth certain exclusions to coverage, including the following:

**m.   Damage to Impaired Property or Property not Physically Injured**
"Property damage" to "impaired property" or property that has not been physically
injured arising out of: (1) [a] defect, deficiency, inadequacy or dangerous condition
in "your product" or "your work;" or (2) [a] delay or failure by you or anyone
acting on your behalf to perform a contract or agreement in accordance with its
terms. . . .

"Your work" means: (a) [w]ork or operations performed by you or on your behalf;
and (b) [m]aterials, parts or equipment furnished in connection with such work or
operations.  "Your work" includes: (a) [w]arranties or representations made at any
time with respect to the fitness, quality, durability, performance or use of "your
work;" and (b) [t]he providing or failure to provide warnings or instructions.

(*Id.*)

Additionally, the Policies provided for coverage — subject to certain exclusions — for

"those sums that [BCORP] becomes legally obligated to pay as damages because of 'personal and

advertising injury.'"  (*Id.*, Ex. 18 at 10 [First Policy].)  "Personal and advertising injury" is defined

as "injury, including consequential 'bodily injury,'" arising out of a number of situations, including

-10-

false arrest, malicious prosecution, and any invasion of the right of private occupancy.  (*Id.*, Ex. 18 at 17 [First Policy].)

## 2.    *Procedural History*

On February 3, 2004, Plaintiffs American Fire and Casualty Company and the Ohio Casualty Insurance Company filed a complaint against Defendants Homeowners, Admiral, BCORP Arlington, and a number of other individuals and entities (the "Additional Defendants").[3] (Compl. for Declaratory Relief [filed Feb. 3, 2004].)  On May 3, 2004, Plaintiffs filed an amended complaint, in which they added BCORP-HRT as a Defendant in the case and sought declaratory judgments on twelve matters, summarized here as: (1) whether "property damage," an "occurrence," or "personal and advertising injury" took place during the coverage period so as to implicate insurance coverage; (2) whether certain exclusions from insurance coverage applied to the alleged actions; (3) whether certain endorsements provided for exclusion from coverage for the alleged actions; (4) whether punitive damages could be awarded in the Underlying Action; and (5) whether Plaintiffs were entitled to equitable subrogation and contribution.  (First Am. Compl.

---

[3]The Additional Defendants were Kevin Williams, Roy Ray, Bette Webbink, Rita Campbell, Anna Goretzki, Joseph Mickey, Marianne Mickey, Irene Harris, Mary Haskins, William Haskins, Ethel Zoeller, Ray Zoglo, Ruth Zoglo, Marian Lefkowicz, and Edward Lefcowicz (collectively, the "Additional Homeowners"); BCORP Holdings of Colorado, Inc. and BCORP Management (collectively, the "BCORP-Related Entities"); Kelly Begg and Gary Begg (collectively, the "BCORP-Related Individuals"); BCORP Canterbury at Riverwalk, LLC ("BCORP Canterbury"); Andrew Graves, Maria Alfaraz, Jon Hess, Melinda Thomas, Ryan Knutsen, Rosemarie Lumetta, Dana Overbey, and David Seddon (collectively, "the Canterbury Plaintiffs"); and North River Insurance Company.  (Compl.)  Because all of these parties have been dismissed from the case, the court refers to them only when necessary for clarity or continuity.

for Declaratory Relief [filed May 3, 2004] [hereinafter "Am. Compl."].)  On May 6, 2004,

Admiral filed an answer and amended cross-claims against Homeowners, BCORP, and certain

Additional Defendants.  (Admiral Ins. Co.'s Answer to Am. Fire and Causalty Co.'s and the Ohio

Casualty Ins. Co.'s Compl. for Declaratory Relief and Am. Cross-Claims [filed May 6, 2004]

[hereinafter "Am. Cross-Compl."].)  Admiral sought damages and a declaratory judgment that it

had no duty to defend or indemnify BCORP in the Underlying Action, pursuant to the terms of

the Policies.  (*Id.*)  On May 19, 2004, Homeowners, the Additional Homeowners, and the

Canterbury Plaintiffs filed an answer to the cross-claims.  (Reply to Admiral Ins. Co.'s Am. Cross

Claims for Declaratory Relief [filed May 19, 2004].)  On May 25, 2004, BCORP, the BCORP-

Related Entities, and the BCORP-Related Individuals filed an answer to Admiral's cross-claims.

(Answer to Am. Cross-Claims [filed May 25, 2004].)

On June 15, 2004, Defendant BCORP Arlington — together with several BCORP-Related

Entities, but excluding BCORP-HRT — jointly moved to stay the action in this court through

completion of the Underlying Action.  (Def. BCORP's Mot. to Stay and Certificate of

Compliance with D.C. COLO. L.Civ.R. 7.1[A] [filed June 15, 2004].)  On July 6, 2004, Plaintiffs

responded to the motion.  (Pls.' Resp. to Def. BCORP's Mot. to Stay and Certificate of

Compliance with D.C. COLO. L.Civ.R. 7.1[A] [filed July 6, 2004].)  On July 14, 2004, Admiral

responded to the motion.  (Admiral Ins. Co.'s Resp. to Def. BCORP's Mot. to Stay and

Certificate of Compliance with D.C. COLO. L.Civ.R. 7.1[A] [filed July 14, 2004].)  On August 2,

2004, BCORP Arlington *et alia* filed a reply in support of the motion.  (Def. BCORP's Reply in

Support of Mot. to Stay [filed Aug. 2, 2004].)  On August 31, 2004, all of the parties to the case

filed a stipulated motion to stay the case pending the outcome of the Underlying Action.
(Stipulated Mot. to Stay [filed Aug. 31, 2004].)  On September 8, 2004, the court granted the
motion and stayed the case through either the resolution of the Underlying Action or September
1, 2005, whichever came earlier.  (Order Granting Stipulated Mot. for Stay [filed Sept. 8, 2004].)
The case was largely inactive over the course of the following year.

On September 1, 2005, all of the parties except for Admiral jointly filed a motion for an
additional sixty-day stay of the proceedings in the case.  (Joint Mot. for Additional [Sixty]-Day
Stay and Certificate of Compliance with D.C.Colo.L.Civ.R. 7.1[A] [filed Sept. 1, 2005].)  On
September 14, 2005, Admiral opposed the motion.  (Def. Admiral Ins. Co.'s Opp'n to Joint Mot.
for Additional [Sixty]-Day Stay [filed Sept. 14, 2005].)  On September 14, 2005, the court denied
the motion to stay and ordered that scheduling proceed.  (Min. Order [filed Sept. 14, 2005].)

On October 14, 2005, BCORP and certain other BCORP-Related Entities filed a renewed
motion to stay proceedings through conclusion of certain underlying litigation and arbitration
concerning a condominium property not relevant to the matter presently before the court.  (Def.
BCORP's Renewed Mot. to Stay and Certificate of Compliance with D.C.Colo.L.Civ.R. 7.1[A]
[filed Oct. 14, 2005].)  On October 24, 2005, Admiral opposed the motion to the extent it
concerned Arlington.  (Def. Admiral Ins. Co.'s Partial Opp'n to Def. BCORP's Renewed Mot. to
Stay [filed Oct. 24, 2005].)  On October 27, 2005, BCORP *et alia* filed a reply in support of the
motion.  (Def. BCORP's Reply in Support of Renewed Mot. to Stay [filed Oct. 27, 2005].)

On November 18, 2005, the Additional Homeowners settled with Plaintiffs and moved to
dismiss themselves from the instant case.  (Mot. to Dismiss Settling Arlington Plaintiffs [sic] [filed

Nov. 18, 2005].)  On November 23, 2005, Plaintiffs moved to dismiss their claims: (1) against

BCORP, the BCORP-Related Entities, and the BCORP-Related Individuals with prejudice; and

(2) against Homeowners and the remaining Defendants without prejudice.  (Unopposed Joint

Mot. to [1] Dismiss Claims Between Pls. and BCORP with Prejudice; [2] Dismiss Pls.' Claims

Against the Underlying Pls. without Prejudice; and [3] Realign Parties [filed Nov. 23, 2005].)

Additionally, Plaintiffs: (1) assigned to BCORP, the BCORP-Related Entities, and the BCORP-

Related Individuals all of their claims against Admiral arising out of BCORP's request for a

defense in the Underlying Action concerning Arlington; and, therefore, (2) moved to realign the

parties in order to substitute BCORP, the BCORP-Related Entities, and the BCORP-Related

Individuals for Plaintiffs in the instant case.  (*Id.*)  On November 30, 2005, Admiral filed a motion

for partial summary judgment on issues concerning Arlington and certain Additional

Homeowners, but not the Homeowners presently at bar.  (Def. Admiral Ins. Co.'s Mot. for Partial

Summ. J. [filed Nov. 30, 2005].)  On December 8, 2005, the court held a status conference, at

which it: (1) granted the November 23, 2005 motion to dismiss; (2) denied the motion to realign

parties; (3) denied all remaining outstanding motions as moot; (4) dismissed the Plaintiffs from the

action; and (5) stayed the case through May 1, 2006.  (Courtroom Mins. [filed Dec. 8, 2005]; *see

also* Order [filed Dec. 9, 2005].)

On March 22, 2006, BCORP filed a suggestion of bankruptcy.  (Suggestion of Bankr.

[filed Mar. 22, 2006].)  BCORP announced that both BCORP-HRT and BCORP Arlington had

filed voluntary petitions under Chapter 7 of the Bankruptcy Code.  (*Id.*)  On August 17, 2006,

due to automatic stay provisions under section 362 of the Bankruptcy Code, this court ordered

that the case remain stayed.  (Min. Order [filed Aug 18, 2006]; *see* Status Report [filed Aug. 17, 2006].)  On September 20, 2006, the bankruptcy court issued an order allowing litigation of the coverage issues pending in this court to continue unabated as of September 27, 2006.  (*See* Joint Stipulated Mot. for Dismissal of Certain Parties and Claims with Prejudice [filed Dec. 12, 2006] [hereinafter "Joint Mot. for Dismissal"].)

On September 29, 2006 the court held a status conference, at which it scheduled a trial of the remaining claims in the case for January 2, 2007.  (*See* Order [filed Oct. 3, 2006].)  On December 7, 2006, the court held a final pretrial conference, at which the parties announced their collective opinion that the remaining issues might be resolved through summary judgment. (Courtroom Mins. [filed Dec. 7, 2006].)  The court provided five days for the parties to prepare and file any desired summary judgment motions.  (*Id.*)  On December 12, 2006, the parties announced to the court that one of the BCORP-Related Entities had assigned to Homeowners BCORP's rights against Admiral for contractual indemnification of the judgments in the Underlying Action.  (Joint Mot. for Dismissal.)  Citing this assignment, the parties filed a stipulated motion to dismiss with prejudice: (1) the Canterbury Plaintiffs, BCORP, the BCORP-Related Entities, and the BCORP-Related Individuals as parties to the litigation; (2) all of Admiral's claims against BCORP, the BCORP-Related Entities, and the BCORP-Related Individuals; and (3) all other claims by and between Admiral, BCORP, the BCORP-Related Entities, the BCORP-Related Individuals, and the Canterbury Plaintiffs.  (*Id.*)  On the same date, the court granted the motion.  (Order Regarding Joint Stipulated Mot. for Dismissal of Certain

Parties and Claims with Prejudice [filed Dec. 12, 2006].)  Upon the court's granting the motion, the only parties remaining in the case were Homeowners and Admiral.

On December 13, 2006, Admiral filed the motion for summary judgment presently at issue.  (Admiral's Br.)  Admiral argues that there is no coverage under the Policies and it has no duty to indemnify because Homeowners did not experience: (1) "property damage" as defined by the Policies, or if they did, said damages would be excluded from coverage; (2) "personal and advertising injury" as defined by the Policies; (3) "bodily injury" as defined by the Policies; or (4) an "occurrence" as defined by the Policies.  (*Id.*)  On January 5, 2007, Homeowners replied to the motion.  (Homeowners' Resp.)  On January 22, 2007, Admiral filed a reply in support of its motion.  (Admiral's Reply.)[4]

## ANALYSIS

### 1.    *Legal Standard*

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, the court may grant summary judgment where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c) (2006); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986); *Concrete Works, Inc. v. City & County of Denver*, 36 F.3d 1513, 1517 (10th Cir. 1994).  The moving party bears the initial burden of showing an absence of evidence to support the nonmoving party's case.  *Celotex*

---

[4]It appears Admiral filed a duplicate reply on January 23, 2007.  (Def. Admiral Ins. Co.'s Reply in Supp. of Mot. for Summ. J. [filed Jan. 23, 2007].)

*Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  "Once the moving party meets this burden, the

burden shifts to the nonmoving party to demonstrate a genuine issue for trial on a material

matter."  *Concrete Works*, 36 F.3d at 1518 (citing *Celotex*, 477 U.S. at 325).  The nonmoving

party may not rest solely on the allegations in the pleadings, but must instead designate "specific

facts showing that there is a genuine issue for trial."  *Celotex*, 477 U.S. at 324; *see* Fed. R. Civ. P.

56(e) (2006).  A fact in dispute is "material" if it might affect the outcome of the suit under the

governing law; the dispute is "genuine" if the evidence is such that it might lead a reasonable jury

to return a verdict for the nonmoving party.  *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir.

1997) (citing *Anderson*, 477 U.S. at 248).  The court may consider only admissible evidence when

ruling on a summary judgment motion.  *See World of Sleep, Inc. v. La-Z-Boy Chair Co.*, 756 F.2d

1467, 1474 (10th Cir. 1985).  The factual record and reasonable inferences therefrom are viewed

in the light most favorable to the party opposing summary judgment.  *Byers v. City of*

*Albuquerque*, 150 F.3d 1271, 1274 (10th Cir. 1998) (citing *Concrete Works*, 36 F.3d at 1517).

**2.      *Evaluation of Claims***

        Although it does not expressly state as much, Admiral clearly seeks summary judgment on

its cross-claims for declaratory relief against Homeowners, in their role as BCORP-assignees.

Admiral does expressly state that all issues concerning its duty to defend have been settled, and

this matter now only concerns whether Admiral has a duty to indemnify.  (Admiral's Br. at 11.)

Accordingly, Admiral requests this court to enter summary judgment and rule that: (1) the jury

award of damages for loss of use, repair costs, and other economic damages in the Underlying

Action did not contemplate "property damage" as defined by the Policies, or, if it did, an

exclusion from coverage applies; (2) the loss of use, repair costs, and economic damages award did not contemplate "personal and advertising injury" as defined by the Policies; (3) the noneconomic damages award did not contemplate "bodily injury" or "property damage" as defined by the Policies; and (4) no "occurrence" as defined by the Policies took place to give rise to the events that led to the Underlying Action or trigger liability under the Policies. (*Id.* at 23.) Alternatively, Admiral requests the court to find that pre-existing damage exclusions from coverage apply to any damages award for "bodily injury" or "property damage." (*Id.* at 24.) Homeowners do not respond to Admiral's arguments concerning either "property damage" or "personal and advertising injury," arguing only that: (1) the noneconomic damages award in the Underlying Action contemplated "bodily injury;" and (2) there was an "occurrence" sufficient to trigger coverage under the Policies. (Homeowners' Resp.)  Consequently, the court deems Admiral's arguments concerning "property damage" and "personal injury and advertising injury" confessed and limits its analysis of Admiral's potential duty to indemnify to those subjects about which Homeowners have advanced arguments.

### a.     *Preliminary Matters: Scope of Evidence and Burden of Proof*

Admiral argues that this court should only consider the trial testimony from the Underlying Action in arriving at its decision, because the issue of indemnity hinges upon the nature of the verdict, judgment, or settlement against the insured.  (Admiral's Br. at 1.) Homeowners argue the court should consider additional evidence beyond the trial testimony and decry the failure of Plaintiffs' counsel either to attend depositions or to develop an evidentiary record regarding coverage issues in the case.  (Homeowners' Resp. at 25–31.)  Although their

attempt to fault Admiral for the action of Plaintiffs' counsel is puzzling, Homeowners' overall

position is correct.  As the Colorado Supreme Court has held, "[t]he determination of whether a

duty to indemnify exists requires factual development, as it is largely a question of fact."  *Cyprus*

*Amax Minerals Co. v. Lexington Ins. Co.*, 74 P.3d 294, 302 (Colo. 2003).  Moreover:

> a trial court should look to the operative complaint as an important factor in
> resolving indemnity disputes . . . .  However, the nature of the claims pled, the
> relief sought and the facts alleged must be considered broadly . . . .  When the facts
> pled, claims asserted and relief sought do arguably include a loss for which an
> insured would potentially be liable, that cannot be the end of the inquiry.  Rather,
> at that point, the court must look to the facts as they developed at trial and the
> ultimate judgment. . . .  Extrinsic evidence may assist the trial court in determining
> whether and to what extent actual liability, as represented by a verdict or
> settlement, is covered by an existing policy.

*Id.* at 301–02.

With this in mind, the court notes that the Policies are contracts, to be interpreted in

keeping with well-settled principles of contract interpretation.  *Compass Ins. Co. v. City of*

*Littleton*, 984 P.2d 606, 613 (Colo. 1999).  Absent the manifestation of a contrary intention

within the four corners of the contract, the language therein must be accorded its plain and

ordinary meaning.  *Rodriguez v. Safeco Ins. Co.*, 821 P.2d 849, 851 (Colo. Ct. App. 1991).

Further, if a contract is clear and unambiguous, the court must enforce it as written rather than

affording it a strained construction.  *Id.* (citing *Chacon v. Am. Family Mut. Ins. Co.*, 788 P.2d

748 [Colo. 1990]); *accord N. Ins. Co. v. Ekstrom*, 784 P.2d 320 (Colo. 1989).  Finally, ambiguity

is a question of law for the court, and "[t]he mere fact that the parties differ in their interpretation

of an instrument does not, of itself, create an ambiguity."  *Rodriguez*, 821 P.2d at 853.  The court

finds that the Policies clearly and unambiguously impose a duty to indemnify any monies owed by

BCORP arising out of "bodily injury," a term the court finds to be clearly and unambiguously defined for the purposes of this case.

Lastly, an insurer's "duty to indemnify arises only when the policy actually covers the harm," which is why indemnity "typically cannot be determined until the resolution of the underlying claims." *Cyprus Amax*, 74 P.3d at 301. To those ends, Homeowners, as BCORP-assignees, have the burden to prove a material issue of fact exists concerning their entitlement to recovery under the Policies. *See Rodriguez*, 821 P.2d at 853. Admiral has the burden to prove the applicability of any exclusions to coverage in order to exempt itself from liability. *See id.*

### b. *Bodily Injury*

Admiral argues that Homeowners did not establish at trial in the Underlying Action and have not established with the evidence presently before the court that they suffered any "bodily injury" such as to trigger coverage under the Policies. (Admiral's Br. at 13–15; Admiral's Reply at 17–33.) Homeowners counter that: (1) they directly testified to "bodily injury;" and (2) even if they did not so testify, "bodily injury" for insurance purposes includes pain and suffering and emotional distress, so long as they are accompanied by physical manifestations of same. (Homeowners' Resp. at 32–34.) Homeowners then argue that the noneconomic damages the jury awarded in the Underlying Action were to compensate for their pain, suffering, and emotional distress, all of which had physical manifestations sufficient to satisfy "bodily injury" within the meaning of the Policies. (*Id.*)

-20-

####    i.      *"Bodily Injury" Proven by Direct Testimony*

First, Admiral asserts that Homeowners did not directly testify to having suffered any "bodily injury, sickness, or disease" as a result of the noise levels at Arlington in the Underlying Action.  (Admiral's Br. at 13–14.)  Admiral cites to and summarizes specific portions of each Homeowner's trial testimony in order to substantiate its position.  (*Id.*)  Undeterred, Homeowners baldly insist they each testified to "personal injury, sicknesses, and illnesses."  (Homeowners' Resp. at 29, Resp. to Statement of Undisputed Facts ¶¶ 28, 39, 43.)  In support of their contention, Homeowners cite generally to a one-hundred-thirty-page excerpt of the trial transcript for the Underlying Action.  (*Id.*, Resp. to Statement of Undisputed Facts. ¶¶ 28, 39, 43.)  Homeowners' general citation is, in essence, a conclusory allegation, for this court has neither the duty nor the inclination to comb through the parties' submissions in an effort to substantiate their contentions.[5]  *See United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) ("Judges are not like pigs, hunting for truffles buried in briefs.").  As is well-established in the law, Homeowners' conclusory allegation cannot suffice to establish a material issue of fact as to whether they suffered "bodily injury," so as to defeat Admiral's motion for summary judgment.  *See L & M Enters. v. BEI Sensors & Sys. Co.*, 231 F.3d 1284, 1287 (10th Cir. 2000) (deeming conclusory allegations insufficient to create a genuine issue of fact to defeat summary judgment).

_____

[5]Further, this general citation fails to satisfy the court's standards, which require that when a party chooses to deny a factual allegation in responding to a motion for summary judgment, the party must make a specific reference to the material in the record.  *See* Practice Standards — Civil, Special Instructions Concerning Motions for Summary Judgment ¶ 4.  Pursuant to this court's definition, a "specific reference" contains "the specific page and line(s) establishing the fact" that is the subject of the allegation.  *Id.* ¶ 2d.

ii. *"Bodily Injury" Proven by Testimony and Extrinsic Evidence*

Alternatively, Homeowners attempt to establish their entitlement to indemnification through a combination of their trial testimony and extrinsic evidence in the form of affidavits now before the court, which they assert demonstrate that they suffered "bodily injury" and the jury in the Underlying Action awarded them damages based thereupon. (Homeowners' Resp. at 31–34.) More precisely, Homeowners: (1) attempt to characterize the damages award as contemplating only emotional distress; and (2) argue the damages were actually awarded for "bodily injury" because "bodily injury" as defined by the Policies "includes coverage for emotional distress if the emotional injury is accompanied by physical manifestations of the injury."[6] (*Id.*) Homeowners are correct that in Colorado, if one suffers emotional distress accompanied by physical manifestations, CGL coverage for "bodily injury" is available. *See State Farm Fire & Cas. Co. v. Nikitow*, 924 P.2d 1084, 1089 (Colo. Ct. App. 1995) (holding physical discomfort and nightmares resulting from emotional distress may serve as "bodily injury" for insurance purposes); *see also Nat'l Cas. Co. v. Great S.W. Fire Ins. Co.*, 833 P.2d 741, 746 (Colo. 1992) (finding "bodily injury" ought include emotional distress when coupled with physical impact, fear of physical harm, or physical manifestation of emotional distress). As it must, the court turns to the complaint and

---

[6] Homeowners also: (1) attempt to characterize the damages award as contemplating only pain and suffering; and (2) argue the damages were actually awarded for "bodily injury" because "[d]amages awarded for pain and suffering are covered under [] CGL in Colorado so long as those damages [sic] are accompanied by physical manifestations." (Homeowners' Resp. at 32.) Homeowners provide no legal support for this contention, and this court finds none. (*Id.*) Accordingly, this argument simply must fail.

the facts of the trial and, in so doing, finds Homeowners' arguments unconvincing.  *See Cyprus*

*Amax*, 74 P.3d at 301–02.

First, Homeowners' characterization of the jury's damage award as being exclusively for

emotional distress is questionably accurate.  The court in the Underlying Action instructed the

jury that in awarding damages for negligence, negligent repair, and violation of the Colorado

Consumer Protection Act, they were to consider:

> Any noneconomic losses or injuries which each individual [Homeowner] has had
> to the present time or which each individual [Homeowner] will probably have in
> the future, including: mental pain and suffering, inconvenience, emotional stress,
> and impairment of the quality of life.

(Admiral's Br., Ex. 1 at 39 [Jury Instructions].)  As the court noted above, the jury awarded each

Homeowner $150,000 in just such noneconomic damages.  (*Id.*, Ex. 11 [Eytcheson Verdict

Form], Ex. 12 [Hosler Verdict Form], Ex. 13 [Suess Verdict Form].)  As Admiral underscores,

the jury did not specify the losses or injuries upon which it based its award.  (*Id.*)  As such, it is

impossible to know with certainty whether the jury based its award fully, partially, or at all upon

Homeowners' emotional distress.  More importantly, even assuming, *arguendo*, that the ratio

could be known, Homeowners' arguments still must fail, as none has established "bodily injury"

within the effective period of the Policies.  In the interest of clarity, the court addresses each

Homeowner's trial testimony and affidavits individually.

### (1)    Mr. Hosler

Mr. Hosler testified at the Underlying Action that living at Arlington was "one of the

worst experiences he had ever had in living anywhere," and asserts his testimony demonstrates he

experienced emotional distress.  (Admiral's Br., Ex. 9 at 101 [Trial Tr.]; *see also* Homeowners'

Resp., Additional Statement of Undisputed Facts ¶ 12.)  Mr. Hosler testified that he: (1) lost sleep

because of the noise he heard in his unit; (2) felt embarrassed because he moved his bed into his

living room to avoid noise; and (3) experienced "frustration" with the noise level in his unit.[7]

(Admiral's Br., Ex. 9 at 109, 115, 145 [Trial Tr.]; *see also* Homeowners' Resp., Additional

Statement of Undisputed Facts ¶ 12.)  Homeowners subsequently assert that Mr. Hosler's

averments in an affidavit now before the court demonstrate the physical manifestations of this

purported emotional distress.  (Homeowners' Resp. at 29, Additional Statement of Undisputed

Facts ¶ 13.)

 Even assuming this testimony suggests emotional distress, rather than inconvenience or

impairment of the quality of life — which is, in and of itself, a large inferential leap — Mr.

Hosler's attempts to establish physical manifestations of said emotional distress fall flat.  In his

affidavit, Mr. Hosler states that he: (1) feels anxious, helpless, and "worn out;" (2) cannot sleep

because of the noise from the unit above him; and (3) has suffered headaches, which he attributes

to his "general lack of sleep and the stress associated with the sound issues."  (*Id.*, Ex. 3 [Hosler

Aff.].)  Clearly, *feelings* of anxiety, helplessness, and exhaustion are not *physical* manifestations.

---

[7]Additionally, Homeowners note that Mr. Hosler testified he "was 'exhausted' from the sound issues" at Arlington.  (Homeowners' Resp., Additional Statement of Undisputed Facts ¶ 12.)  In fact, Mr. Hosler used the term in an entirely different context — to mean that he "exhausted" his remedies, because he "went through every step [he] could to try to resolve the issue."  (Admiral's Br., Ex. 9 at 131 [Trial Tr.].)  The court frowns upon Homeowners' misrepresentation of Mr. Hosler's testimony and stresses that it will not countenance such transgressions in future submissions.

Further, by his own admission, noise — not emotional distress — caused Mr. Hosler's loss of sleep. (*Id.*)  Moreover, even if emotional distress had caused Mr. Hosler's lack of sleep, it still would not suffice to establish a physical manifestation, because "[a]lthough sleeplessness may affect the body, it is usually considered an aspect of mental suffering." *ERA Franchise Sys. v. N. Ins. Co.*, 2000 U.S. App. LEXIS 2493, at *18 (10th Cir. Feb. 17, 2000); *see also ERA Franchise Sys., Inc. v. N. Ins. Co.*, 32 F. Supp. 2d 1254, 1259 (D. Kan. 1998) ("[I]nsomnia is insufficient to qualify as the requisite physical manifestation of an emotional distress claim."); *SL Indus.*, 607 A.2d at 1273 (holding sleeplessness to be an emotional condition, because to find otherwise "would be tantamount to conceding that emotional and physical injuries are indistinguishable"). Accordingly, the court need only examine Mr. Hosler's third assertion concerning his headaches.

Headaches may serve as a physical manifestation of emotional distress. *ERA Franchise Sys.*, 2000 U.S. App. LEXIS 2493, at *18 (citing *SL Indus.*, 607 A.2d at 1273).  Nevertheless, Mr. Hosler's alleged headaches may not serve in this case to allow him to survive summary judgment. Mr. Hosler's sole allegations as to headaches are that he has experienced them and he attributes them to stress and lack of sleep. (Homeowner's Resp., Ex. 3 [Hosler Aff.].)  Fatally to his claim, Mr. Hosler makes no allegation as to timing.  As noted above, indemnification under the Policies is only appropriate where the "'bodily injury' . . . occur[red] during the policy period." (Admiral's Br., Ex. 18 at 6 [First Policy], Ex. 19 at 6 [Second Policy].)  In this case, Mr. Hosler has failed to demonstrate a genuine issue of fact as to whether he suffered the alleged "bodily injury" during the period of time either of the Policies was active.  Accordingly, Admiral is entitled to summary judgment on its cross-claim regarding Mr. Hosler.

### (2)    Ms. Suess

Ms. Suess's allegations are similarly problematic.  Ms. Suess testified that she heard loud sounds in her unit and lost sleep "from the noise problems."  (Homeowners' Resp., Additional Statement of Undisputed Facts ¶ 14.)  As with Mr. Hosler, even assuming, *arguendo*, that these allegations are sufficient to establish emotional distress, Ms. Suess cannot establish the physical manifestations thereof such as to demonstrate "bodily injury" as defined by the Policies.  In an affidavit now before the court, Ms. Suess states that she experiences, ostensibly as physical manifestations of her emotional distress: (1) distraction and difficulty in concentration; (2) feelings that she was "swindled;" (3) anxiety, depression, frustration, and feelings of helplessness; (4) emotional outbursts; (5) "sleep deprivation as a result of the soundproofing issues;" (6) aggravated asthma; (7) an impact on her appetite; (8) "tension stress knot in [her] stomach . . . mostly in the evenings;" and (9) headaches from her lack of sleep.  (*Id.*, Ex. 4 [Suess Aff.].)

Ms. Suess's anxiety, depression, concentration problems, feelings that she was swindled, and emotional outbursts are plainly not physical in nature and, *a fortiori*, cannot be physical manifestations of her purported emotional distress.  Further, Ms. Suess testified that she lost sleep from the noise in her unit, not from emotional distress.  (Admiral's Br., Ex. 10 at 36 [Trial Tr.]; *see also* Homeowners' Resp., Additional Statement of Undisputed Facts ¶ 15.)  Nonetheless, the court notes that even if her sleeplessness had been caused by emotional distress, as discussed above, loss of sleep is not a *physical* manifestation of emotional distress.  *See ERA Franchise Sys.,* 2000 U.S. App. LEXIS 2493 at *18.  With regard to her asthma, Ms. Suess merely states that her "asthma has been aggravated," leaving open the cause of such aggravation.

(Homeowners' Resp., Ex. 4 [Suess Aff.].)  Fatally to her claim, Ms. Suess testified that leftover dust in her unit from repairs and ash in the air from a large forest fire exacerbated her asthma. (Admiral's Br., Ex. 10 at 32–33 [Trial Tr.]; *see also* Homeowners' Resp., Additional Statement of Undisputed Facts ¶ 15.)  By Ms. Suess's own testimony, dust and ash, not emotional distress, caused her asthma problems.  (*Id.*)  Finally, Ms. Suess gives no temporal context to her allegations concerning her appetite, stomach irritation, or headaches.  (Homeowners' Resp., Ex. 4 [Suess Aff.].)  Indeed, Ms. Suess makes her allegations concerning stomach discomfort and headaches in the present tense, suggesting that they are ongoing as of the time of her January 4, 2007 affidavit.  (*Id.*)  Without even so much as an allegation that Ms. Suess experienced these purported physical manifestations of her emotional distress during the period of time either of the Policies was active, this court cannot find a genuine issue of fact concerning same.  Accordingly, Admiral is entitled to summary judgment on its cross-claim concerning Ms. Suess.

### (3)   *Ms. Eytcheson*

Ms. Eytcheson's claims are problematic as well.  During the course of the Underlying Action, Ms. Eytcheson testified that she: (1) felt paranoid and like she was "in a daze;" (2) felt so anxious she became rude and demanding with people, which embarrassed her; (3) did not feel safe or comfortable in her unit; (4) had trouble sleeping; (5) had "problems with [her] lower back;" (6) constantly inhaled dust while BCORP performed soundproofing repairs; (7) constantly wanted to sleep; and (8) felt embarrassment upon hearing her neighbors use and flush their toilets. (Homeowners' Resp., Ex. 8 at 237, 260–62, 282 [Trial Tr.].)  As physical manifestations of this purported emotional distress, Ms. Eytcheson states that she: (1) has experienced depression and

difficulty relaxing; (2) lacks focus; (3) has a short temper; (4) has problems with her judgment; (5) fears she will again experience soundproofing and other similar issues if she moves to a new home; (6) has difficulty sleeping; (7) has gained weight; (8) has missed work "because of upset stomachs and the overall sense of stress;" and (9) has "been known to experience regular twitching in [her] eye." (*Id.*, Ex. 5 [Eytcheson Aff.].) Ms. Eytcheson's claims suffer from the same shortcomings as those of the other Homeowners.

First, Ms. Eytcheson's problems with depression, relaxing, focus, temper, judgment, and fears are not physical problems and thus are not physical manifestations of emotional distress. Nor is Ms. Eytcheson's sleeping difficulty a physical problem, as stated above. *See ERA Franchise Sys.,* 2000 U.S. App. LEXIS 2493, at *18. As to her remaining allegations, Ms. Eytcheson fails to allege a causal link between her emotional distress and either her eye twitch or her stomach problems. (Homeowners' Resp., Ex. 5 [Eytcheson Aff.].) Moreover, Ms. Eytcheson gives no temporal context to her allegations regarding her twitch, stomach problems, or weight gain. (*Id.*) As with the other Homeowners, Ms. Eytcheson's allegations are insufficient to establish a genuine issue of fact that she suffered "bodily injury" during the effective period of the Policies. Consequently, Admiral is entitled to summary judgment on its cross-claim concerning Ms. Eytcheson. Because the court has resolved the instant matter through analysis of "bodily injury," analysis of whether an "occurrence" took place would be superfluous.

*3.*     *Conclusion*

Based on the foregoing it is therefore ORDERED that:

1.  Admiral's motion for summary judgment (#170) is GRANTED.

2.  The clerk shall forthwith enter final judgment in favor of Admiral and against

Homeowners as BCORP-assignees on Admiral's cross-claims.  Admiral may have its costs by

filing a bill of costs within eleven days of the date of this order.


Dated this 7th day of March, 2007

                                        BY THE COURT:


                                        s/ Edward W. Nottingham
                                        EDWARD W. NOTTINGHAM
                                        United States District Judge