**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Christine M. Arguello**

Civil Action No. 04-cv-00197-CMA-BNB

ADMIRAL INSURANCE COMPANY,

      Plaintiff,

v.

DAVID HOSLER,
CHRISTINE SUESS, and
DEBBIE EYTCHESON.

      Defendants.

---

**ORDER AND MEMORANDUM OF DECISION GRANTING
MOTION FOR SUMMARY JUDGMENT**

---

      This is an insurance coverage case arising out of a faulty construction case.

The alignment of parties in this matter is rather unusual, as only defendants remain

as active parties in the case.  Defendants David Hosler, Christine Seuss, and Debbie

Eytcheson (collectively, the "Homeowners"), assert that they – as assignees of Former

Defendants BCORP-HRT LLC ("BCORP-HRT") and BCORP Arlington, LLC ("BCORP

Arlington," together, collectively, "BCORP") – are entitled to insurance coverage under

policies issued by former Defendant and now Plaintiff Admiral Insurance Company

("Admiral") for a judgment entered in Homeowners' favor and against BCORP.  This

matter comes before the Court on Admiral Insurance Company's Renewed Motion for

Summary Judgment, filed September 19, 2008 (Doc. # 214).  This Court's jurisdiction is

premised upon diversity of citizenship, pursuant to 28 U.S.C. §1332.  For the reasons

stated below, the Court GRANTS Admiral's renewed motion.

## FACTS

### I.    FACTUAL BACKGROUND

This case has a complicated history, which the Court previously summarized

at length in a March 7, 2007 Order on Admiral's first motion for summary judgment[1]

(the "March 7 Order," Doc. # 177).  Accordingly, the Court presents only a cursory

synopsis of the facts in this Order.  In short, this matter concerns questions about

insurance coverage relating to a judgment awarded to Homeowners after successful

trial of their claims (the "Underlying Action") regarding the faulty construction and repair

of a condominium project in Littleton, Colorado, known as "Arlington."[2]

### A.    Arlington and the Homeowners

BCORP Arlington and BCORP-HRT were, respectively, the developer and

general contractor for Arlington.  In constructing Arlington, BCORP omitted certain

sound- and fire-proofing implements, substituted certain wall construction materials, and

substituted certain joists called for in the architectural plans.  It is undisputed that

---

[1]    On October 31, 2008, this case was reassigned from Judge Edward W. Nottingham to
Judge Christine M. Arguello.

[2]    To this Court's understanding, BCORP and related individuals formerly involved in
this case undertook two condominium projects, "Arlington" and "Canterbury," which were the
subjects of two separate faulty construction suits in Colorado State Court.  The Canterbury case
was ultimately resolved through arbitration, while the Arlington case was fully litigated through
trial.  Accordingly, in the interest of clarity, this Court will refer to only the Arlington case as the
"Underlying Action."

BCORP's omissions and substitutions adversely affected Arlington's fire safety rating and soundproofing.  In August 2000, September 2000, and September 2001, respectively, Homeowners David Hosler, Christine Suess, and Debbie Eytcheson purchased and inhabited condominium units at Arlington.  All three Homeowners claim that their units were excessively noisy, and the noise – which included, but was not limited to the following noises from other units: (1) televisions, phones, vacuums and other appliances running, ringing, and beeping; (2) water running and toilets flushing; and (3) people conversing, walking about their units, and coming and going – caused them to lose sleep.  Mr. Hosler and Ms. Suess both testified that loud noise awakened them during their first nights in their units.  Mr. Hosler and Ms. Eytcheson both reported sleeping in the living room of their units to avoid the noise they could hear in their bedrooms.  The Homeowners all testified to some form of disappointment, frustration, and embarrassment because of the living situation at Arlington.  Ms. Eytcheson also reported paranoia, anxiety, and weight gain.

### B.    Arlington Repairs and the Underlying Action

In 2002, BCORP attempted to make repairs to Arlington to remedy the noise problems.  In performing the repairs, BCORP used over-length screws that pierced the building framing and soundproofing, thereby rendering the soundproofing even less effective.  Dissatisfied with the repairs, Homeowners and several other Arlington residents filed the Underlying Action against BCORP on or about August 29, 2002.

Homeowners' claims for violation of the Colorado Consumer Protection Act, negligence, and negligent repair, and Mr. Hosler's and Ms. Suess' separate claims for breach of implied warranty and breach of contract were tried to a jury. The jury was instructed as follows:

Each individual plaintiff has the burden of proving, by a preponderance of the evidence, the nature and extent of their individual damages. If you find in favor of each individual plaintiff on their claims for negligence, negligent repair, or violation of the Colorado Consumer Protection Act, you must determine the total dollar amount of each individual plaintiff's damages, if any, that were caused by the negligence by the particular defendant.

In determining such damages, you should consider the following:

1.      Any non-economic losses or injuries which each individual plaintiff has had to present time or which each individual plaintiff will probably have in the future, including: mental pain and suffering, inconvenience, emotional distress, and impairment of the quality of life.

2.       Any economic losses or injuries which each individual plaintiff has had to the present time or which each individual plaintiff will probably have in the future. In considering damages in this category, you shall not include cost of repairs or loss of use because these damages, if any, are to be included in a separate category.

3.      The reasonable cost of additional necessary future repairs to the property.

4.      An amount that will reasonably compensate the plaintiff for any loss of use of his or her condominium unit during the time reasonable required to make the reasonable and necessary future repairs.

Homeowners prevailed. The jury awarded each Homeowner $150,000 in non-economic damages and $1,500 in damages for loss of use, as well as various amounts

for economic damages and damages for reasonable and necessary repairs.  In total,

Mr. Hosler was awarded $186,355.05; Ms. Suess, $182,596.51; and Ms. Eytcheson,

$180,235.20.  BCORP filed for bankruptcy in 2006, and presumably cannot pay the

damages awarded Homeowners.  Accordingly, at issue in the instant case is whether

the awarded damages trigger coverage under two insurance policies Admiral issued to

BCORP.

### C.    The Admiral Insurance Policies

Admiral issued two policies to BCORP: A01AG09920 (the "First Policy"), effective

from January 31, 2001 through January 31, 2002, and A02AG12517 (the "Second

Policy," collectively, the "Policies"), effective from January 31, 2002 through January 31,

2003.  Both Policies contained the following language setting forth the nature of

coverage:

> [Admiral] will pay those sums that [BCORP] becomes legally obligated to
> pay as damages because of "bodily injury" or "property damage" to which
> this insurance applies. . . .  This insurance applies to "bodily injury" or
> "property damage" only if: (1) [t]he "bodily injury" or "property damage"
> [was] caused by an "occurrence;" and (2) [t]he "bodily injury" or "property
> damage" occur[red] during the policy period.

The Policies define "bodily injury" as any "bodily injury, sickness or disease sustained by

a person, including death resulting from any of these at any time."  Further, the Policies

define "occurrence" as "an accident, including continuous or repeated exposure to

substantially the same general harmful conditions."

Further, both Policies contain Pre-Existing Damages Exclusions, which state

that the Policies will not cover the following types of damages relating to "bodily injury"

independent of whether such "bodily injury" is known or unknown:

> (a)     [damages] which first occurred prior to the inception date of this
> policy . . .; or
>
> (b)     [damages] which are, or are alleged to be, in the process of
> occurring as of the inception date of the policy . . . even if the
> "occurrence" continues during this policy period.

## II.     PROCEDURAL HISTORY[3]

On May 3, 2004, American Fire and Casualty Company ("American Fire") and

the Ohio Casualty Insurance Company ("Ohio Casualty") filed an amended complaint

against Defendants Homeowners, Admiral, BCORP, and a number of other individuals

and entities, seeking declaratory judgments on twelve matters.[4]  On May 6, 2004,

Admiral filed an answer and cross-claims against Homeowners, BCORP, and several

additional parties no longer relevant to the instant case, seeking damages and a

declaratory judgment that it had no duty to defend or indemnify BCORP in the

Underlying Action.  On May 19, 2004, Homeowners, along with other now-irrelevant

parties, answered the cross-claims.  On May 25, 2004, BCORP, along with other now-

irrelevant parties, answered Admiral's cross-claims.

---

[3]  This case has a lengthy and contentious history, set forth fully in the Court's March 7, 2007 Order granting Admiral's first motion for summary judgment.  Thus, the Court presents only an abbreviated version.

[4]  At one point, some twenty-five additional individuals and four additional entities were parties to this case.  All have since been dismissed.  Accordingly, the Court makes no more reference to these individuals and entities than necessary for clarity.

On August 31, 2004, the parties filed a stipulated motion to stay the case pending the outcome of the Underlying Action. On September 8, 2004, the Court granted the motion and stayed the case until either the resolution of the Underlying Action or September 1, 2005, whichever was to come earlier. On September 15, 2005, the Court denied additional stays and ordered the case to go forward.

On November 18, 2005, several individual (and now irrelevant) party-defendants settled with American Fire and Ohio Casualty and moved to dismiss themselves from the case. On November 23, 2005, American Fire and Ohio Casualty moved to dismiss their claims: (1) against BCORP and several irrelevant individuals and entities with prejudice; and (2) against Homeowners and several other irrelevant individuals without prejudice. Additionally, American Fire and Ohio Casualty: (1) assigned to BCORP their claims against Admiral arising out of BCORP's request for defense in the Underlying Action; and (2) moved to realign the parties, substituting BCORP and several now-irrelevant entities as plaintiffs.

On December 8, 2005, the Court: (1) dismissed American Fire's and Ohio Casualty's claims; (2) dismissed American Fire and Ohio Casualty from the action; (3) denied the motion to realign parties; (4) denied all remaining outstanding motions as moot; and (5) stayed the case through May 1, 2006. On March 22, 2006, BCORP filed a suggestion of bankruptcy, announcing that both BCORP-HRT and BCORP Arlington had filed voluntary petitions under Chapter 7 of the Bankruptcy Code. On August 17, 2006, the Court ordered that the case remain stayed, due to the automatic stay

provisions of the Bankruptcy Code. On September 20, 2006, the Bankruptcy Court issued an order allowing litigation of the coverage issues pending before this Court to continue.

On December 12, 2006, the parties announced that BCORP had assigned its rights against Admiral for indemnification of the judgments in the Underlying Action to the Homeowners. In light of the assignment, the parties filed, and the Court granted, a stipulated motion to dismiss with prejudice: (1) the plaintiffs to the Colorado State Court litigation involving the Canterbury property (the "Canterbury Plaintiffs"), BCORP, and certain irrelevant BCORP-related entities and individuals from the action; (2) all of Admiral's claims against BCORP, and certain irrelevant BCORP-related entities and individuals; and (3) all other claims by and between the Canterbury Plaintiffs, Admiral, BCORP, and the above-referenced irrelevant BCORP-related entities and individuals. After the Court granted the motion, the only parties remaining in the case were Defendants Homeowners and Admiral.

On December 13, 2006, Admiral filed a motion for summary judgment, in which it argued there was no coverage under the Policies and it had no duty of indemnification. The Court granted the motion on March 7, 2007 (the "March 7 Order," Doc. # 177). Homeowners successfully appealed the Court's decision. On June 11, 2008, the Tenth Circuit issued an order vacating this Court's decision and remanding the case (the "Tenth Circuit Order," Doc. # 191). The Appellate Court reasoned that this Court: (1) improperly looked beyond the State Court record in the Underlying Action when

it considered affidavits that Homeowners submitted in support of their claims of bodily injury; and (2) improperly failed to consider the Homeowners' trial testimony submitted in support of their claims. Further, the Appellate Court suggested that this Court certify the question of what physical manifestations of emotional distress are sufficient to evidence "bodily injury" within the meaning of the Policies. On August 26, 2008, this Court issued an order certifying the aforementioned question to the Colorado Supreme Court (Doc. # 202). On September 18, 2008, the Colorado Supreme Court issued an order declining to answer (Doc. # 212).

On September 19, 2008, Admiral filed a renewed motion for summary judgment (Doc. # 214). Admiral argues that Homeowners are not entitled to coverage under the Policies because Homeowners were not awarded damages for "bodily injury" within the meaning of the Policies and Homeowners' injuries were not caused by an "occurrence" within the meaning of the Policies. Alternatively, Admiral argues that pre-existing damage exclusions contained in the Policies preclude any coverage for bodily injury the Homeowners suffered. On October 14, 2008, Homeowners filed a response to the motion (Doc. # 218). On November 3, 2008, Admiral filed a reply in support of the motion (Doc. # 221).

## ANALYSIS

## I.    STANDARD OF REVIEW

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, the Court may grant summary judgment where "the pleadings, the discovery and disclosure materials

on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c) (2008); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-50 (1986); *Concrete Works, Inc. v. City & County of Denver*, 36 F.3d 1513, 1517 (10th Cir. 1994). The moving party bears the initial burden of showing an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). "Once the moving party meets this burden, the burden shifts to the nonmoving party to demonstrate a genuine issue for trial on a material matter." *Concrete Works*, 36 F.3d at 1518 (citing *Celotex*, 477 U.S. at 325). The nonmoving party may not rest solely on the allegations in the pleadings, but must instead designate "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324; *see* Fed. R. Civ. P. 56(e)(2) (2008). A fact in dispute is "material" if it might affect the outcome of the suit under the governing law; the dispute is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party. *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997) (citing *Anderson*, 477 U.S. at 248). The Court may consider only admissible evidence when ruling on a summary judgment motion. *See World of Sleep, Inc. v. La-Z-Boy Chair Co.*, 756 F.2d 1467, 1474 (10th Cir. 1985). The factual record and reasonable inferences therefrom are viewed in the light most favorable to the party opposing summary judgment. *Byers v. City of Albuquerque*, 150 F.3d 1271, 1274 (10th Cir. 1998) (citing *Concrete Works*, 36 F.3d at 1517).

## II. EVALUATION OF CLAIMS

### A. Matters at Issue

Admiral has conceded that the only remaining issues in this case surround the question of whether Admiral owes a duty to indemnify BCORP and, therefore, owes a duty to Homeowners as BCORP's assignees. The duty to defend and other issues in this case have dwindled and disappeared, along with the original parties. In Colorado, "the duty to indemnify relates to the insurer's duty to satisfy a judgment entered against the insured" and "arises only when the policy actually covers the alleged harm" that underlies the entered judgment.[5] *Cyprus Amax Minerals Co. v. Lexington Ins. Co.*, 74 P.3d 294, 299 (Colo. 2003). Simply stated, "indemnity flows from the nature of the ultimate verdict, judgment, or settlement." *Id.* at 301. Accordingly, the determination of whether an insurer has a duty to indemnify "requires factual development, as it is largely a question of fact." *Id.* at 302. Heeding the instructions of the Tenth Circuit and the jurisprudence of the Colorado Supreme Court, this Court has reviewed the complaint in the case and considered the allegations broadly in the context of the Policies to determine whether "the facts pled, claims asserted and relief sought do arguably include a loss for which an insured would potentially be liable." *Id.* at 301-02; *see McGowan v. State Farm Fire & Cas. Co.*, 100 P.3d 521, 524 (Colo. Ct. App. 2004); *see also Am. Fire and Cas. Co. v. BCORP Canterbury at Riverwalk LLC*, 282 Fed.

---

[5] Because this Court's jurisdiction is premised upon diversity of citizenship, Colorado substantive law guides this case. *See Clark v. State Farm Mut. Auto. Ins. Co.*, 319 F. 3d 1234, 1240 (10th Cir. 2003).

Appx. 643, 649 (10th Cir. June 11, 2008) (Doc. # 191). The Court finds BCORP's

allegations in its cross-claims against Admiral, particularly paragraphs 13 and 18,[6] are

sufficient to establish that coverage under the Policies for bodily injury suffered by the

Arlington Homeowners may possibly attach. As such, the Court must next interpret the

Policies to determine whether coverage attaches to the injuries testified to at trial by the

Arlington Homeowners in the Underlying Action.

In so doing, the Court notes that the Policies are contracts that must be

interpreted in keeping with long-established principles of contract interpretation.

*Compass Ins. Co. v. City of Littleton*, 984 P.2d 606, 613 (Colo. 1999). The language

in the Policies must be accorded plain and ordinary meaning. *Terranova v. State Farm

Mut. Auto. Ins. Co.*, 800 P.2d 58, 60 (Colo. 1990). Further, if the language of the

Policies is clear and unambiguous, the Court must enforce the Policies as they are

written and may not apply a strained construction. *Rodriguez v. Safeco Ins. Co.*, 821

P.2d 843, 851 (Colo. Ct. App. 1991). As a matter of course, ambiguity is a question

of law for the Court, and the fact that parties may differ in their interpretation of a

contract does not, in and of itself, create ambiguity. *Id.* at 853. Indeed, "a term

used in a contract is ambiguous when it is susceptible to more than one reasonable

---

[6]   Paragraph 13 alleges: "Both the 2001 and 2002 Policies obligate Admiral to pay all sums that any named insured becomes legally obligated to pay for property damage, bodily injury or personal injury to which either Policy applies."

Paragraph 18 alleges: "The property damage, bodily injury, personal injury and loss of use alleged in the Arlington Action falls within the scope of the insurance coverage afforded to Plaintiffs in both the 2001 Policy and the 2002 Policy."

interpretation, [but] a mere potential for more than one interpretation of such term[,] considered in the abstract, does not create an ambiguity." *Allstate Ins. Co. v. Juniel*, 931 P.2d 511, 513 (Colo. Ct. App. 1996) (citing *Hecla Mining Co. v. N.H. Ins. Co.*, 811 P.2d 1083). It follows that, in order to determine whether an instrument contains an ambiguity, "the test to be applied is not what the insurer intended by his words, but what the ordinary reader and purchaser would have understood them to mean." *W. Coast Life Ins. Co. v. Hoar*, 505 F. Supp. 2d 734, 744 (D. Colo. 2007) (citing *Davis v. M.L.G. Corp.*, 712 P.2d 985, 989 (Colo. 1986) (other citations omitted)). With this framework in mind, the Court turns to its analysis.

### B. "Bodily Injury" Defined

As noted in the Tenth Circuit Order, the Colorado Supreme Court has held that claims for "purely nonphysical or emotional harm" are not sufficient to serve as "bodily injury" for purposes of triggering insurance coverage. *Am. Fire & Cas. Co.*, 282 Fed. Appx. at 650-51 (citing *Nat'l Cas. Co. v. Great SW Fire Ins. Co.*, 833 P.2d 741, 746 (Colo. 1992)). An insured must establish "physical manifestations" of the emotional harm or distress in order to trigger coverage for "bodily injury." *Nat'l Cas. Co.,* 833 P.2d at 746. However, the Colorado Supreme Court has not opined as to the parameters of the "physical manifestations" sufficient to establish "bodily injury" or as to whether the term "bodily injury" is ambiguous. Further, as noted above, the Colorado Supreme Court declined to speak to the issue when this Court presented it in the form of a certified question. Thus, this is an issue of first impression under Colorado law and

this Court must make its best "'*Erie* guess' as to what the Colorado Supreme Court would decide if it were faced with the question." *Rexrode v. Allstate Indem. Co.*, 2007 U.S. Dist. LEXIS 58216, at *4-5 (D. Colo. Aug. 9, 2007) (citing *Pehle v. Farm Bureau Life Ins. Co.*, 397 F.3d 897, 901-02 (10th Cir. 2005); *Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938)).

There is little precedent to guide this Court's determination regarding the issue at bar. Homeowners cite several Colorado cases, including *Johnson v. Overright Trucking*, *Inc.*, which itself cites several cases in its examination of "serious physical manifestations" in the context of negligent infliction of emotional distress. Case No. 04-cv-01070 2005 WL 1719738, at *3 (D.Colo. 2005) (citing *Towns v. Anderson*, 579 P.2d 1163 (Colo. 1978); *Parr v. Triple L & J Corp.*, 107 P.3d 1104, 1108 (Colo. Ct. App. 2004); *Colwell v. Mentzer Invs., Inc.*, 973 P.2d 631 (Colo. Ct. App. 1998)). These tort cases are of limited value in guiding consideration of the insurance law issues in the instant case. "Tort law and insurance law are not coextensive." *SL Indus. Inc. v. Am. Motorists Ins. Co.*, 607 A.2d1266, 1275 (N.J. 1992). A claim for negligent infliction of emotional distress can be sustained by manifestations of "physical or *mental* illness." *Towns*, 579 P.2d at 1165 (emphasis added). In contrast, as the Colorado Supreme Court has specifically opined, purely mental harm is not sufficient to establish "bodily injury" in the insurance context. *Nat'l Cas.*, 833 P.2d at 746. Further, this Court is not convinced that an ordinary reader or purchaser of insurance, reading a policy in order to discern what is covered under the policy, would interpret the term "bodily injury" as

referring to the scope and breadth of tort claims rather than to the plain language meaning of the term "bodily injury."

This Court is persuaded by the logic of the New Jersey Supreme Court as set forth in *SL Industries Inc. v. American Motorists Insurance Company*, 607 A.2d 1266 (N.J. 1992). In that case, the New Jersey Supreme Court held, and this Court agrees, that "in the context of purely emotional distress, without physical manifestations, the phrase 'bodily injury' is not ambiguous." *Id.* at 1274; *see also ERA Franchise Sys. v. N. Ins. Co.*, Case No. 99-3022, 2000 U.S. App. LEXIS 2493, at *15 n.1 (10th Cir. 2000) (citing cases and holding "the overwhelming majority of jurisdictions which have considered the issue hold that 'bodily injury' standing alone or defined in a policy as 'bodily injury [or harm], sickness or disease' is unambiguous and encompasses only physical harm") (citations omitted). This Court agrees further that the difficulty in distinguishing mental and physical injuries can render the term "bodily injury" ambiguous in certain cases and "[t]he phrase should be analyzed on a case-by-case basis to determine whether the alleged injuries are sufficiently akin to physical injuries to render the term 'bodily injury' ambiguous." *SL Indus.*, 607 A.2d at 1274.

In addressing the issue of whether the Homeowners suffered "bodily injury" which would trigger coverage under the Policies, the Court agrees with the Homeowners that the Tenth Circuit ruling in the instant case precludes this Court from considering any evidence of bodily injury beyond that presented to the jury at the trial of the Underlying Action. As such, this Court has disregarded Admiral's references to the

15

Homeowners' deposition testimony and discovery responses. Rather, the Court has confined its review of the facts to a careful and detailed examination of the transcript of testimony given by the Homeowners during the trial of the Underlying Action.

## C.    "Bodily Injury" in the Instant Case

As it did in its first motion for summary judgment, Admiral argues that the judgment in the Underlying Action was not based on any "bodily injury" to Homeowners sufficient to trigger coverage under the Policies or, if there was any bodily injury, it was not caused by an "occurrence" within the ambit of the Policies. Homeowners posit that their emotional distress physically manifested itself sufficiently to be deemed "bodily injury" and the nature of the damage award implies physical injury. With respect to two of the Homeowners, the Court disagrees that the record supports the arguments of the Homeowners.

### 1.    Mr. Hosler

In refuting Admiral's allegation that Mr. Hosler never testified to any corporeal injury, illness, or disease caused by the inadequate soundproofing at Arlington, Homeowners reference several lines of Mr. Hosler's trial testimony and a page of the Tenth Circuit Opinion that provides a summary of the testimony. The Court accepts as accurate the following summary of the relevant portions of Mr. Hosler's testimony, as set forth in the Homeowners' Response to the Motion for Summary Judgment (Doc. # 218 at 20-21):

(a)    His experience at the Arlington was one of the worst experiences he ever had (p. 101, ll. 17-18);

(b)     Mr. Hosler suffered from significant noise problems from above and beside his unit (p. 101, l. 17 to p. 108, l. 14);

(c)     Mr. Hosler suffered sleep deprivation from the noise (p. 109, ll. 6-19);

(d)     The noise was so bad he moved his bed out of the bedroom and put it in the living room where he slept for years (p. 113, ll. 5-24);

(e)     Mr. Hosler was embarrassed by the noise and what he had to do to deal with the noise (p. 114, l. 19 to p. 115, l. 2);

(f)     The noises he heard included snoring of the neighbors next door, televisions, blenders, microwaves (p. 119, l. 12 to p. 120, l. 23);

(g)     Mr. Hosler "exhausted" his opportunities to correct the sound issues (p. 131, ll. 1-16);[7]

(h)     Mr. Hosler suffered frustration and sleep loss from the noise (p.145, ll. 6-15);

Within the plain meaning of the phrase as an ordinary insured would understand it, "bodily injury" connotes some sort of physical harm. Several of Mr. Hosler's allegations do not refer to any physical harm or injury whatsoever. Mr. Hosler's claims concerning the music that woke him, the placement of his bed, the noises he could hear from his unit, and his attempts at resolving the noise problems make no reference to injury and, therefore, cannot be deemed claims of "bodily injury." Similarly, Mr. Hosler's complaints that living at the Arlington was a terrible experience and that he felt frustrated, embarrassed, and dissatisfied cannot possibly be construed as "bodily injury." *Feelings* of negativity, frustration, dissatisfaction, and embarrassment are,

_____

[7]   Although Homeowners' briefing suggests that Mr. Hosler was exhausted from the sound issues, Mr. Hosler's trial testimony is as follows, "I exhausted – I went through every step I could to try and resolve this issue."  (Doc. # 215, Ex. 7 at 131.)

by definition, emotional and not physical harm or "bodily injury," within the plain meaning of the term. The only complaints that could possibly be construed as "bodily injury" concern Mr. Hosler's loss of sleep, and this Court finds these complaints, as testified to by Mr. Hosler, to be insufficient.

First, causation is lacking. Mr. Hosler's allegation is not that his emotional distress manifested itself in his loss of sleep, but that the "crinkle" and "click" noises from earplugs he wore, the noise level at the Arlington generally, and music from a neighbor kept him from sleeping. (Doc. # 215, Ex. 7 at 102 l.11, 109, ll.13-14, 145, ll.6-15.) But even assuming Mr. Hosler could establish that his lost sleep was really a manifestation of his emotional distress, his allegations still would not be sufficient. This Court is persuaded by precedent stating that loss of sleep cannot trigger insurance coverage for "bodily injury." Specifically, this Court is persuaded by the Tenth Circuit's interpretation of Kansas law, finding that "[a]lthough sleeplessness may affect the body, it is usually considered an aspect of mental suffering. It is not ordinarily considered a physical injury to the body or a sickness of the body." *ERA Franchise Sys.*, 2000 U.S. App. LEXIS 2493, at *18. This Court is further persuaded by the New Jersey Supreme Court's reasoning that "sleeplessness . . . is, at base, emotional in nature. To designate sleeplessness a physical injury would be tantamount to conceding that emotional and physical injuries are indistinguishable." *SL Indus.*, 607 A.2d at 1273. In light of the stated precedent, the Court finds that Mr. Hosler's allegations of lost sleep do not render the term "bodily injury" ambiguous. Because Mr. Hosler makes no allegations of "bodily

18

injury," there can be no genuine issue of fact regarding whether coverage exists with respect to his claims in the Underlying Action.

### 2. Ms. Suess

In refuting Admiral's allegations that Ms. Suess did not testify to "any corpor[e]al injury, sickness, or disease related to any alleged emotional distress caused by inadequate soundproofing," Homeowners point to one page of the Tenth Circuit Order (which summarizes Mr. Hosler's testimony) and several lines of Ms. Suess' trial testimony. The Court accepts as accurate paragraphs (a), (b), (c), and (e) of the statements summarizing the relevant portions of Ms. Suess' testimony, as set forth in the Homeowners' Response to the Motion for Summary Judgment (Doc. # 218 at 21-22):

(a) she had problems with sound in her unit, including the sound of running water from the pipes loud enough to awake her from sleep (p.17, l. 1 to p. 18, l. 10);

(b) she would be awakened in the middle of the night by the flushing of toilets in another unit (p.17, l. 1 to p. 18, l. 10);

(c) she could hear the sound of normal conversations in other units (p. 18, ll. 11-25);

(d) the dust and mess caused by the negligent repair caused a flare up in her asthma (p. 32, l. 18 to p. 34, l. 1);[8]

(e) she suffered sleep loss from the noise problems (p.35, l. 4 to p. 36, l. 5).

---

[8] The trial testimony indicated that while repairs were being made to her unit, Ms. Suess stayed in a non-air-conditioned unit in a different building and, in that unit, ash and dust from a forest fire that came through open windows caused her asthma to flair up. (Doc. # 215, Ex. 9 at 32:18-33:9)

The claims by Ms. Suess do not render the term "bodily injury" ambiguous. Her claims concerning what she could hear in her apartment make no reference to physical harm and, therefore, are not claims of "bodily injury" within the plain meaning of the term. Further, Ms. Suess' claims concerning her *feelings* of frustration, anger, and deception are purely emotional in nature and, thus, also not "bodily injury" within the plain meaning of the term. With respect to the claims in paragraph (d) above relating to Ms. Suess' testimony concerning aggravation of her asthma, construing the facts in the light most favorable to her, this claim of injury could possibly fall within the plain meaning of the Policies' definition of "bodily injury" as a "sickness or disease." However, Ms. Suess points to no evidence to support or suggest that her asthma problems were a physical manifestation of her emotional distress. Indeed, by her own testimony, ash and dust from a fire caused her asthma flair-up.[9] This causation runs directly counter to the Homeowners' fundamental assertion that the injuries suffered were "result[s] of the emotional distress caused by having to endure continuous and repeated excessive sound transmission," (Doc. # 218 at 27) and cannot serve to bolster Ms. Suess' claim. Finally, Ms. Suess' allegations that sounds of running water and other noises caused her to wake in the night and to lose sleep are insufficient to establish "bodily injury" due to causation problems. As with Mr. Hosler's allegations, by Ms. Suess' own testimony, the cause of her lost sleep was noise in her apartment.

---

[9] In keeping with the Tenth Circuit Order, the Court refuses to consider allegations contained in Ms. Suess's Responses to Interrogatories concerning her asthma, and looks only to the testimony before the jury in the Underlying Action.

(Doc. # 215, Ex. 9 at 36, ll.1-3)  But even if Ms. Suess could establish that her lost sleep was a physical manifestation of her emotional distress, as set forth above, sleeplessness is not "bodily injury" within the plain meaning of the term and, therefore, cannot serve to trigger coverage under the Policies.  *See ERA Franchise Sys.*, 2000 U.S. App. LEXIS 2493, at *18; *SL Indus.*, 201, 607 A.2d at 1273.  Because Ms. Suess makes no allegations of "bodily injury" as physical manifestations of her emotional distress, there can be no genuine issue of fact regarding whether coverage exists with respect to her claims in the Underlying Action.

      3.   <u>Ms. Eytcheson</u>

      Ms. Eytcheson makes similar references to those made by Mr. Hosler and Ms. Suess to support her claim, citing one page of the Tenth Circuit Opinion (which summarizes Mr. Hosler's and Ms. Suess' testimony) and several lines of her trial testimony.  The Court accepts as accurate the following summary of the relevant portions of Ms. Eytcheson's testimony, as set forth in the Homeowners' Response to the Motion for Summary Judgment (Doc. # 218 at 22-23):

(a)    [she had] problems sleeping and problem with her lower back (p. 236, ll. 2-3);

(b)    [she suffered] embarrassment at hearing toilets flush (p. 237, ll. 10-14);

(c)    she could hear people urinating in other units when in her own unit (p. 238, ll. 10-14);

(d)    she could hear people speaking in a normal voice, televisions, opening and closing of microwave doors as well as beeping (p. 239, l. 2 to p. 241, ln. 7);

(e)     she had to try to sleep with the fan on but that did not work (p. 236, l. 5 to p. 237, l. 1);

(f)     these noises physically kept her awake and disturbed her rest (p. 241, l. 6 to p. 242, l. 18);

(g)     she could hear people walking around upstairs (p. 242, ll. 3-12), vacuums (p. 245, ll. 2-4), and the ringing of telephones in other units (p. 245, ll. 12-21);

(h)     she could hear cupboard doors open and close, doorways opening and closing, and people talking and walking in the hallway (p.242, l.14 to p. 244, l. 5);

(I)     she was forced to move into her living room to sleep at night to try and avoid the noise (p. 247, l. 22 to p. 248, l. 10);

(j)     she "found [herself] from not sleeping at night to wanting to sleep all the time. That's not only because I am tired because I don't want to have to deal with all of this." (p. 260, ll. 13-18);

(k)     she felt paranoid (p. 260, l. 22);

(l)     she found herself in "a daze" because of all of this (p. 261, l.1);

(m)    she found herself "so anxious that I have been rude and obnoxious and demanding to the people that I work with and that's not who I am. I have been so embarrassed about how I have been acting." (p. 261, ll. 14-18);

(n)     she no longer felt safe and comfortable in her home (p. 261, l. 25 to p. 262, l. 1);

(o)     directly related to the sound and repair of sound issues, she was unable to breathe without inhaling dust (p. 282, ll. 12-15).

Ms. Eytcheson's allegations do not render the term "bodily injury" ambiguous.

Like those of the other Homeowners, Ms. Eytcheson's allegations concerning what

she could hear in her unit, what noise-avoidance actions she took, what non-habitual

actions she took, and what she inhaled are irrelevant, as they are not allegations of

physical harm or "bodily injury" within the plain meaning of the term.  Similarly, her allegations concerning her *feelings* of paranoia, anxiety, dazed confusion, lack of safety, and embarrassment necessarily all concern purely emotional harm and not "bodily injury" within the plain meaning of the term.  As set forth above, loss of sleep is not "bodily injury" within the plain meaning of the term.  *See ERA Franchise Sys.*, 2000 U.S. App. LEXIS 2493, at *18; *SL Indus.*, 201, 607 A.2d at 1273.  Therefore, Ms. Eytcheson's allegations of lost sleep cannot serve to create an issue of fact regarding coverage under the Policies.

Ms. Eytcheson's only claims that could be considered allegations of "bodily injury" within the plain meaning of the term concern her back pain and weight gain, both of which are arguably physical harms.  Ms. Eytcheson's testimony regarding back pain was a passing statement made in response to the question "[d]id you experience any sound problems at your unit when you moved in?"  Her response was, "I had noticed noise in my bedroom where the water lines go, it sounded like tapping.  And I really didn't think a whole lot about it.  I had slept off and on with a fan previously.  And I started having problems with my lower back and I had a hard time sleeping in my bed or whatever . . . ."  (Doc. # 215, Ex. 12 at 236, ll. 2-3.)  Later in her testimony, Ms. Eytcheson states, "Well, the couch was uncomfortable because of my lower back so I did have difficulty sleeping on the couch."  (Doc. # 215, Ex. 12 at 248, ll. 9-10)  Nothing in this testimony establishes that the "problems with [her] lower back" were physical manifestations of her emotional distress resulting from the actions of BCORP.

This limited testimony is insufficient to establish that Ms. Eytcheson's back pain was a physical manifestation of her emotional distress and, therefore, cannot support her claim for bodily injury such as would trigger coverage under the Policies.

Ms. Eytcheson's testimony concerning her weight gain is similarly sparse and dismissive. After being asked whether she was "comfortable" and whether she felt "at home" at Arlington, Ms. Eytcheson testified, very generally, that "[d]uring the last 4 years [she had] probably gained about 30 to 40 pounds." (Doc. # 215, Ex. 12 at 262 ln. 7.) In totality, Ms. Eytcheson testified that she gained weight and "put food in [her] mouth to comfort [herself]." (*Id.* at 262 ln. 7-9.) This testimony lacks causation and is not sufficient to raise a question of fact as to whether her weight gain was a physical manifestation of her emotional distress so as to trigger coverage under the Policies. Accordingly, the Court gives no further consideration to either Ms. Eytcheson's back pain or weight gain.

**CONCLUSION**

Based on the foregoing, it is ORDERED that:

1.       Admiral Insurance Company's Renewed Motion for Summary Judgment (Doc. # 214) is GRANTED.

2.       The Clerk of the Court shall enter judgment in favor of Plaintiff Admiral and against Defendants Hosler, Suess, and Eytcheson on Plaintiff Admiral's cross-claims for declaratory judgment.

3.      Plaintiff Admiral Insurance Company may have its costs by filing a bill of

costs within eleven days of this Order.

DATED:  February  17  , 2009

                                        BY THE COURT:

                                        _____
                                        CHRISTINE M. ARGUELLO
                                        United States District Judge